AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Eastern District of California

**FILED**

DEC 05 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| YANIV GOHAR, OREL GOHAR, MAY LEVY, and ERAN BUHBUT | ) |
| | ) **2:17 - MJ - 0202    CKD** |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   September 10, 2015 through November 29, 2017   in the county of   Sacramento   in the

Eastern   District of   California   , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1955 | Conducting an Illegal Gambling Business |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Christian E. Norgaard, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/5/2017

_____
*Judge's signature*

City and state:   Sacramento, CA

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Christian E. Norgaard, being duly sworn, depose and state as follows.

## BACKGROUND AND EXPERTISE OF THE AFFIANT

1.        I am a Special Agent with the California Department of Justice – Bureau of Gambling Control (BGC) and a Task Force Officer with the Federal Bureau of Investigation. I am authorized to request search warrants pursuant to Rule 41 of the Rules of Criminal Procedure.

2.        In April of 2001, I attended the California Department of Justice, Special Agent Trainee Academy. The course of instruction included, but was not limited to the following: Drug Trafficking, Drug Diversion and Pharmaceuticals, Informant Management, Surveillance Techniques, and Search and Seizure and Search Warrants. Between September 2001 and September 2005, I was employed as a Special Agent with the California Department of Justice, Bureau of Narcotic Enforcement, San Francisco Regional Office.

3.        In September 2005, I was assigned to the Bureau of Gambling Control, Sacramento Regional Office. Since coming to the Bureau of Gambling Control, I have personally conducted, or actively participated in, no less than 25 illegal gambling-related investigations, and have observed first-hand the manner in which wagers are made, accepted, transferred, recorded, and held, and the various methods utilized for paying, collection, losing, and winning wagers. I have prepared and actively participated in the preparation and service of no less than 25 arrest and search warrants of individuals for gambling-related violations. I have conducted investigations involving the possession and sales of illegal slot machines.

4.        Additionally, I have personally conducted, or actively participated in, investigations dealing with grand theft, identity theft, vandalism, forgery, and possession for sale of narcotics, at Indian casinos and licensed cardrooms.

5.        During these investigations, arrests and service of search warrants, I have interviewed and interrogated numerous individuals involved in various illegal gambling activities, and I am aware of the procedures, routines, and methods of operations for these

Page 1  AFFIDAVIT OF CHRISTIAN E. NORGAARD

particular crimes.

6.      I have attended advanced schools and training conferences where I received training in the areas of legal and illegal gambling investigations, organized crime, financial investigations/money laundering, search and seizure, computer crime, criminal intelligence, evidence, and testimony, and search warrant preparation and execution.  I have spoken to investigators that have attended specific bookmaking and vice crimes training and learned the methods used to place and process illegal wagers and the proceeds therefrom.

7.      The facts in this affidavit are based on my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

## NATURE OF THE APPLICATION

8.      This affidavit is submitted in support of a criminal complaint against Yaniv Gohar, Orel Gohar, May Levy, and Eran Buhbut for violations of 18 U.S.C. § 1955.  As set forth below, there is probable cause to believe that the above individuals are involved in operating an illegal gambling business in the Eastern District of California.

## APPLICABLE LAW

9.      18 U.S.C. § 1955 states that "whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both."  An illegal gambling business is defined as "a gambling business which-- (i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."

10.     In turn, California Penal Code § 330b prohibits, inter alia, the manufacture, sale,

Page 2  AFFIDAVIT OF CHRISTIAN E. NORGAARD

or transportation of any slot machine or device.  A slot machine or device is defined in this section as "a machine, apparatus, or device that is adapted, or may readily be converted, for use in a way that, as a result of the insertion of any piece of money or coin or other object, or by any other means, the machine or device is caused to operate or may be operated, and by reason of any element of hazard or chance or of other outcome of operation unpredictable by him or her, the user may receive or become entitled to receive any piece of money, credit, allowance, or thing of value, or additional chance or right to use the slot machine or device, or any check, slug, token, or memorandum, whether of value or otherwise, which may be exchanged for any money, credit, allowance, or thing of value, or which may be given in trade, irrespective of whether it may, apart from any element of hazard or chance or unpredictable outcome of operation, also sell, deliver, or present some merchandise, indication of weight, entertainment, or other thing of value."  The video slot machines discussed herein qualify as "slot machines" under this section of California law.

## STATEMENT OF PROBABLE CAUSE

A. **Background of the Investigation**

      11.    The California Department of Justice – Bureau of Gambling Control (BGC) and the FBI are investigating an organization involved in illegal gambling, hereinafter referred to as the "Gohar Organization" or the "Organization."  This Organization controls a large number of illegal video slot machines placed in small Northern California retail stores such as markets, gas stations, liquor stores, and smoke shops.  These stores are located in both the Northern and Eastern Districts of California.  The machines operate much the same as a traditional slot machine that you would see in a legal and regulated tribal casino or in Nevada.  They have a bill acceptor and games of chance such as Poker, Keno, Cherry Master and Lucky-8 Lines.  Winners are paid out by the store, which is in turn reimbursed by the Gohar Organization.  Within the Organization, there is a division of labor that includes salespeople, collectors, and managers.  Salespeople attempt to find new locations to place machines and assist with their installation;

Page 3  AFFIDAVIT OF CHRISTIAN E. NORGAARD

collectors visit the stores on a regular basis to collect money from the machines and maintain the relationship with the store; and managers oversee operations within a geographic area and resolve disputes.

12.     Among the individuals involved in this investigation are:  Yaniv Gohar (hereinafter referred to as "Yaniv"), his brother, Orel Gohar (hereinafter "Orel"), May Levy, and Eran Buhbut.  All four are from Israel, and all reside in the San Francisco Bay area.  Based on the investigation to date, they appear to be part of a larger enterprise that operates approximately 500 machines throughout California.  It is not uncommon for a machine to generate $1,000 per week.  Some generate much more.

13.     Yaniv Gohar, a.k.a. "Tony," is the suspected leader of the Organization.  He resides in Berkeley, California.  He utilizes his brother, Orel Gohar, a.k.a. "Adam," May Levy, a.k.a. "Mike," and Eran Buhbut (who also occasionally went by "Adam," as described herein) to facilitate the operation.  Yaniv represents himself as a businessman in the construction and home improvement business.  He owns three properties in Oakland, California, and a business called United Home SF, Inc., all of which were funded to a significant degree by businesses controlled by one of Yaniv's associates.  Orel Gohar of San Francisco, California, is a line manager and money collector in the Organization.  He directly oversees May Levy, of Walnut Creek, California, who acts as a money collector and salesman for the Organization.  Orel receives significant funding from an apparent cosmetics company.  He confided to a Confidential Human Source (hereinafter referred to as CHS) that he is committing marriage fraud in order to establish legal permanent residency in the United States.  Eran Buhbut is a collector in the organization.  He lives in Oakland and typically collects from slot machines located in businesses in the San Francisco Bay Area, primarily the city of San Jose.  Buhbut appears to have no legitimate form of employment or income.

14.     This investigation has utilized the services of the Confidential Human Source (CHS).  The CHS has been working with the FBI since January 2004.  During that time, the FBI

Page 4  AFFIDAVIT OF CHRISTIAN E. NORGAARD

has paid him/her approximately $23,225.19 for both services and expenses. CHS also received a $1,000.00 payment from the BGC for services. Notwithstanding such payments, the CHS is also motivated by a sense of patriotism and a desire to assist law enforcement to address crime in his/her community.

15.     In 2016, the BGC and FBI worked with CHS in an investigation of Nive Hagay, a.k.a. "Dino the Casino." Hagay operated an illegal video slot machine business similar to the one at the focus of this investigation. CHS's reporting was used in support of search warrants in the Eastern and Central Districts of California and a criminal complaint against Hagay in the Eastern District of California. On May 18, 2017, Hagay pleaded guilty to one count of 18 U.S.C. § 1955 (Illegal Gambling), and one count of 21 U.S.C. § 841(a)(1) (Distribution of Cocaine). Much of the CHS's reporting has been corroborated through other investigative techniques. The CHS's criminal history consists of an arrest in 2013 and subsequent conviction for driving under the influence.

16.     During the investigation, CHS was the manager and part-time owner of a smoke shop in Sacramento, California. CHS had numerous meetings with Orel Gohar and May Levy. CHS had two meetings with Yaniv Gohar. CHS recorded several of these meetings with both audio and video recording devices. In these recorded conversations, the subjects discussed the operation of the gambling business as well as other criminal activities such as what happens with cash generated from the business and the participation in fraudulent marriage to gain immigration status in the U.S. Summaries of some of these meetings with the CHS will be presented later in this affidavit.

B. **Similarity to Past Investigation**

17.     The current investigation is similar to an investigation the BGC and FBI conducted from 2009 to 2016 of another group of Israelis involved in similar gambling activity involving illegal slot machines. This historical investigation, which resulted in no criminal charges, is summarized below to illustrate how the two organizations are related to one another

Page 5  AFFIDAVIT OF CHRISTIAN E. NORGAARD

and operate in a similar manner.

18.     Yariv Tuval was identified as the leader of this other, related organization (hereinafter "Tuval Organization"). In approximately late 2015 or early 2016, Los Angeles Police Department Detective Albert Shinfeld contacted me to provide information about Tuval. Shinfeld said he had received information from a confidential source that Tuval sold a gambling business to Yaniv Gohar. Telephone records for Yaniv's mobile telephone number, 917-748-4848, show approximately 12 calls with Tuval's telephone number, 917-669-8787, between July 7, 2015 and February 4, 2016.

19.     Several members of the Tuval Organization confessed their participation and described to investigators how the organization worked. They described how the organization used email accounts to report on the performance of its slot machines. The following paragraphs summarize what these members told me.

20.     On May 12, 2011, I interviewed Or Michael. Michael said he was responsible for collecting money from approximately 60 slot machines placed in businesses located throughout the San Francisco Bay area. He maintained a list of all store locations that had a machine. The list was usually kept on a spreadsheet in his email. Each week he was required to send an email with the total amount of money he collected from each location. He would not say to whom the email was sent, and he claimed that the email address had recently changed. On the same day as the interview, agents executed a search warrant at his residence and recovered a spreadsheet containing a list of Bay Area stores similar to the one he described.

21.     On May 26, 2011, I interviewed Confidential Source 1 (CS-1). CS-1 said s/he previously worked with Michael. In addition to describing how the organization worked, CS-1 said that the head of the group gave CS-1 an email address that was used to log the number of businesses that had slot machines and the amount of money collected from those machines. CS-1 said that s/he would put this information into an Excel spreadsheet and email it on a weekly basis. The boss frequently changed the email address.

Page 6  AFFIDAVIT OF CHRISTIAN E. NORGAARD

22.    On July 6, 2011, I interviewed Confidential Source 2 (CS-2). CS-2 said s/he previously worked with Michael. In addition to describing how the organization worked, CS-2 said s/he was required to send a weekly email to his boss describing stores that had slot machines and how much money was collected from each. The boss provided the email account and changed it every few months.

23.    On June 5, 2012, I contacted Confidential Source 3 (CS-3), who was working for the organization in Arizona. CS-3 said s/he was responsible for recording the weekly collections of money from the video slot machines in an Excel spreadsheet. CS-3 said s/he was required to email this spreadsheet to himself/herself every Sunday. The organization provided him/her with the email account, tonyaz1986@yahoo.com, for this purpose. Later in the investigation, investigators obtained subscriber information and connection logs for this email account. The connection logs included Internet Protocol addresses (IP addresses) assigned to the homes of known members of the organization.

C. **Current Investigation**

24.    *Orel Gohar*: During the month of September 2015, I received information from a Citizen Informant (CI) stating that s/he saw a video slot machine inside Famous Smoke Shop located at 3022 Stockton Boulevard, Sacramento, California. On September 10, 2015, I visited the location and observed the video slot machine located on the west wall of the business. Based on my training and experience, I recognized the device as an illegal video slot machine. It was housed in a black wood cabinet that had colored buttons that said, "Start," "Take," "Double," "Small," and "Big." The video monitor looked like a traditional slot machine with three lines running vertical and three lines running horizontal that contained fruit, bell, and "bar" images. At the bottom of the screen there was a "Credit" section and a "Bet" section. An unidentified customer of the business was gambling on the device while I was there. Below is a photo of the device.



25.     I contacted the store manager, Wesley Huang, who told me the slot machine was installed by a white male adult (WMA), later identified as Orel, who spoke with an accent, possibly Israeli. Huang did not know Orel's name but later identified him from his California driver's license photograph. The device had been placed in the store around July 2015. Orel provided Huang with a key to the device that allowed him to access the area of the machine where the cash was kept. Huang said the profits were split 50-50 with Orel and that he (Huang) was responsible for paying out winning customers. The slot machine brought in approximately $1,000.00 per week, which was split evenly between Orel and Huang ($500.00 each on average).

26.     On Thursday, December 17, 2015, I confirmed that Orel lived at 2445 Shoreline Drive #317, Alameda (no longer his current residence). I contacted apartment manager Jacqueline Mendez who provided this additional information on Orel:

27.     Orel moved to that apartment in January 2015. Rent for that unit was $2,000.00 a month. Orel provided the following telephone number on his rental application: 415-416-9804. Mendez said that she had texted him on that number before. Orel said that he was in the cleaning

business, but I could find no supporting documentation in his rental application. He did provide a document from Chase Bank as verification of funds to afford the rent. This letter showed a deposit of $98,970.00 made on December 12, 2014. (For reasons explained later in this affidavit, this document is suspected to be fraudulent). Orel listed his employer name as "Eran" and his occupation as "Area Manager," which earned him $7,000.00 per month. Orel provided the telephone number for "Eran" as 415-875-0832. (This is the telephone number Huang used to contact Orel in the past.) Orel wrote that he had been employed as such for three years.

28.     During the month of January 2017, I conducted an Accurint database inquiry on Orel and saw that he had a new address of record of 88 Howard Street #1709, San Francisco, California. An open source search showed this address was associated with the "Carmel Rincon Luxury Apartments." According to its website, http://www.carmelapartments.com/carmel-rincon-san-francisco-ca, these "apartment homes" rent anywhere from $2,735.00-$6,255.00 per month and have a "a view unlike any other, including vistas of the North Bay, Financial District, Bay Bridge, Ferry Tower or South of Market." A photo posted on Orel's Facebook page shows him in a high rise building with a view of the Bay Bridge in the background. This is Orel's current residence (as confirmed on November 21, 2017).

29.     _May Levy_: On December 10, 2015, Huang told me that Orel and another WMA, later identified as May Levy, were currently inside his business servicing an illegal video slot machine. Huang said Orel and Levy arrived in separate vehicles. Levy was driving a gold Dodge Caravan van, California license plate number 7NAJ022 (R/O: May LEVI, 588 Sutter Street #14, San Francisco, CA). Orel collected the money from the slot machine and gave Huang $430.00 in U.S. currency. Orel told Huang that he was training Levy.

30.     _Eran Buhbut_: Confidential source information provided to me approximately five years ago identified Buhbut as being a collector in the Tuval organization. As explained later in this affidavit, Buhbut currently works as a collector under Yaniv Gohar. This fact lends credibility to the previously cited LAPD report that Yariv Tuval sold a gambling business to

Yaniv Gohar. It appears that Buhbut continued with his job as a collector despite the ownership change.

31.    During this investigation, I received assistance from a citizen informant (CI) who operates the El Catrin Bar located at 2255 Alum Rock Avenue, San Jose, California. This CI has provided reliable information in the past, and much of his/her reporting in this investigation has been corroborated. In fact, this CI provided information about Or Michael during the Tuval Organization investigation. This CI is motivated by a desire to assist law enforcement with the crime problem in his/her community and has never received payment in exchange for his/her cooperation. The CI has no criminal history. During the month of May 2016, the CI reported that two Israeli Nationals that had come to his/her business. They asked if s/he wanted them to place a video slot machine inside. I directed the CI to allow the device to be installed with the plan of identifying other co-conspirators in the Gohar investigation.

32.    On June 8, 2016, two Israeli Nationals returned to install the slot machine. I am uncertain if they are the same individuals from the May 2016 meeting. The CI texted a photo of the two vehicles that were driven to the store location. The first vehicle was a silver Nissan Pathfinder, California license plate number 7RUR101 (R/O: May Mordechay Levy, 588 Sutter Street #304, San Francisco). This is the same May Levy described in this affidavit. The second vehicle was a tan Isuzu SUV, California license plate number 6XZK041 (R/O: Eran BUHBUT, 1530 6th Avenue #14, Oakland). The CI identified both Levy and Buhbut from photos I showed him/her from their respective Facebook accounts. Buhbut called himself "Adam" and left the CI the following telephone number: 415-947-9712. (As explained later in this affidavit, this number was listed in the contacts of a phone belonging to Yaniv Gohar.) The CI told me the agreement was that s/he would split the slot machine profits 50-50 with Buhbut. Since the time of the installation, the CI has reported that Buhbut has come to collect from the slot machine on a near weekly basis through November 22, 2017.

Page 10  AFFIDAVIT OF CHRISTIAN E. NORGAARD

D. **Interactions with the CHS**

33.     CHS allowed the Gohar Organization to install and operate video slot machines in his/her South Sacramento smoke shop.  Shortly after their installation, I operated one of the machines and determined based on my training and experience that it met the criteria for an illegal video slot machine in the State of California.  CHS managed this smoke shop until November 2017 and provided information about the Gohar Organization since the time of the installation.  CHS interacted with Yaniv Gohar, Orel Gohar, and May Levy to discuss the operation and management of these machines.  Many of these meetings were recorded.  Presented below are summaries of some of these meetings.

34.     *January 2, 2017 (not recorded)*:  May Levy installed a video slot machine in the South Sacramento smoke shop managed by CHS.  CHS was not at the business when the slot machine was first installed.  An employee at the business called CHS and put Levy on the phone to discuss the installation with the CHS.  Levy identified himself to CHS as "Mike."  Before departing the store, he left a note with his phone number.  CHS later showed me video surveillance from his/her store of "Mike" installing the slot machine, and I recognized him as May Levy.  During the investigation, Levy visited CHS's store on several other occasions, and CHS always addressed him as "Mike."

35.     *January 10, 2017 (not recorded)*:  This is the first time CHS met both Orel Gohar and May Levy.  CHS called me after their visit and provided me with the following summary:

36.     Orel Gohar identified himself as "Adam" and Levy identified himself as "Mike."  They explained to CHS how the slot machine worked and that they would split the proceeds 50-50 with CHS.  CHS inquired about getting a "Keno" style gambling machine, and Orel Gohar said he would look into it.  Orel told CHS that s/he could make a lot of money with these gambling devices and then showed him/her a large wad of U.S. currency.  Orel said that they would be back next week to collect money from the slot machine.  On the same date, both Orel and Levy also visited Famous Smoke Shop and inquired about installing a second machine at the

store.  During the investigation, Orel visited the CHS's store on several other occasions, and CHS always addressed him as "Adam."

37.     *January 18, 2017 (recorded)*:  Both Orel Gohar and May Levy visited the business.  I listened to the audio and recognized both subjects' voices based on my review of other audio and audio/video recordings in which they are heard speaking.  The glass door to the front of the CHS's smoke shop had been recently damaged.  Orel told the CHS to keep the money from the slot machine and use it to pay for a new door.  Orel again told the CHS that s/he could make a lot of money with the slot machine.  He ordered a new "Keno" machine for the CHS and said it would be delivered from Miami in 3–4 weeks.  Orel said that he paid $2,000.00 for the "Keno" machine.  Levy can be heard replacing the motherboard in the slot machine while they talked.  Orel stated that the CHS could earn as much as $400.00 per week with the slot machine s/he already had in the store.  Orel said that he was from Tel Aviv and had been in the United States for six years.  Levy said that he had been here for two years.  Orel claimed to have a customer (two brothers) on Turk Street in San Francisco.  He further claimed that these brothers had one of Orel's slot machines installed in their store and make $12,000.00– $13,000.00 per week.  Orel said they made a half million dollars from him last year, and he suggested they buy a building with all of the money.  Orel said he also has a slot machine in a store on Eddy Street in San Francisco that is frequented by "nasty" people that cash their government checks in order to gamble on the device.  Orel told CHS they would be back with the new slot machine the next time they returned.

38.     *February 9, 2017 (recorded)*:  Orel Gohar and Levy visited the store to install a second slot machine.  They discussed where to place the machines inside the store.  Orel showed CHS all the games that can be played on the video slot machine, naming a few.  He said he set a machine to the highest payout setting of 65%.  He gave CHS a key and explained how the machine worked, including how to remove money.

39.     *February 23, 2017 (recorded)*:  Orel Gohar told CHS that the machines are

Page 12  AFFIDAVIT OF CHRISTIAN E. NORGAARD

between legal and illegal, that they are everywhere, and that they can be easily removed if necessary. Orel also stated the following: that he has worked in the gambling business for six years, and no one has ever gotten in trouble or arrested; that the worst outcome was a $500.00 fine; and that CHS should play stupid if confronted about the machines. He further admonished CHS to say that s/he did not know it was illegal and does not know anything about them, including how much money they make. S/he should offer to have them removed. Orel said one of his stores is earning $2,500.00 every two weeks. His partner has a store in San Francisco that earns $30,000.00 a month. It takes time to reach these levels. He assures CHS that after five months, CHS's machines will each make $1,000.00 a week. As proof, Orel shows CHS pictures stored on his phone showing the "in" and "out" figures of several machines to demonstrate how much they can make. Orel announced the "in" and "out" figures of CHS's machines, which he said generated a combined income of $853.00.

40.     Orel described his organization as a "gang" led by three "rich as fuck" bosses. One of the bosses resides in Israel; the other two are in the U.S. Together they have 500 machines all over the area. Orel is responsible for 50 machines. He has machines in Stockton, Davis, Fairfield, Modesto, and San Jose, California. He earns a salary plus a commission.

41.     Orel and CHS discussed the sale of a 2002 Nissan Pathfinder, which was registered to Levy. After saying that he would call his boss to come up with a price, Orel is heard speaking (apparently on the telephone) in a language other than English. After this conversation, Orel told CHS that the boss wanted $1,400.00, $1,000.00 up front and $400.00 to be deducted from the store's share of money generated by the machines.

42.     *February 27, 2017 (not recorded)*: CHS traveled to Berkeley, California, to inspect and ultimately purchase the 2002 Nissan Pathfinder that Orel had offered for sale. When s/he arrived, CHS met with Orel and Yaniv, who introduced himself as "Tony." This was the first of two meetings CHS had with Yaniv. CHS attempted to audio record this meeting but was unsuccessful. During the meeting, Orel introduced Yaniv as his brother. CHS expressed to

Page 13  AFFIDAVIT OF CHRISTIAN E. NORGAARD

Yaniv his/her desire to install a third slot machine at his/her smoke shop, but Yaniv denied the request. After the meeting, CHS recognized the "Tony" with whom he had just dealt from Yaniv Gohar's California DMV photo.

43. _March 2, 2017 (recorded)_: Orel told CHS that he would be visiting the store every week. They discussed Yaniv's denial of CHS's request to install a third machine at his/her store. During this conversation, they referred to Yaniv as "Tony." Orel echoed Yaniv's denial by admonishing CHS that the FBI's main office is in Sacramento, and they (meaning the Organization) don't want to be "shining" or "flashing." Orel stated that Yaniv has been in the business for seven years. He has two partners in California. He is not involved in the day-to-day operations.

44. CHS asked what would happen if someone did not pay what is owed to the organization. Orel responded that Yaniv would handle that responsibility. Orel stated, "We take the machine and . . . fuck him over." Orel does not deal with such issues, but Yaniv will pay $10,000 to make an example of the debtor, so that others don't follow suit. Orel earns a salary plus a percentage of what he collects. Orel further stated that Levy does not collect; he is a salesman.

45. On the topic of immigration, Gohar said he has a green card, which he received a long time ago. He said he's married, stating, "I married to a fag for my papers, stupid...It's the easy way." When asked if he paid her, Orel stated, "of course," explaining that he met his wife one day before he got married. He bought her a dress for the wedding photos. Orel said he did not have sex with her. The marriage was only business. Orel described his wife as a lesbian. He paid her $10,000. He applied three months after getting married and had his green card in six months. He's waiting for the ten-year mark to become a citizen. Orel's wife lives in Los Angeles, and he has lived in San Francisco since he arrived from Israel. At this meeting, Orel was unable to check the machines and settle with CHS because the machines were in use.

46. _March 8, 2017 (recorded)_: During this meeting, Orel said he was concerned

because he was summoned for an immigration-related interview in Sacramento, California. His wife is still committed to helping him at this interview. Orel paid her an additional $1,000.00 and took photos with her in Los Angeles. Orel said he thinks immigration might be interested in him because he is "laundering money." CHS asked what he does with all the cash. Orel said he gives it to a partner who purchases money orders. Orel said you can also give money to a Rabbi as a donation. The money goes into the bank and is sent to Israel for a 3% fee. It becomes "brand new." This Rabbi is in Los Angeles. He only deals in amounts of $100,000 or more.

47.     While working on the gambling machines at the store, Orel commented that the players liked a particular machine. One of the machines earned $1,108.00, and the other earned $741.00. Orel explained that he takes a photo of a receipt showing each machine's performance, because the bosses want to know how much money he makes. After explaining this to the CHS, Orel says, "No also. Don't forget. These paper, this numbers go into the computer."

48.     _March 23, 2017 (recorded)_: Orel told CHS that a third slot machine was being brought to the store today. Orel said that one machine made a profit of $969.00 and the other earned $423.00 for a total of $1,392.00 for the week. As a continuation of their conversation about the Rabbi, CHS asked if it would be possible for CHS to send less than $100,000.00 to Israel through the Rabbi. Orel said that would not be possible, that the minimum amount the Rabbi would take is $100,000.00 because, "he's not small money." He typically launders amounts in the half million to million dollar range. People typically give him, "400 thousand, a half million, million, 700 thousand." Orel said he trusts the Rabbi a lot, and his group does good business with him.

49.     _March 29, 2017 (recorded)_: The CHS complained to Orel that Levy had not showed up over the weekend with a new game, as promised. Orel said it wasn't Levy's fault because Orel thought he had the game at his storage unit. He was mistaken. Orel told the CHS that the game had been ordered and would arrive next week.

50.     Orel said the slot machines made a total of $1,953.00. Orel said his best store is in San Francisco, because it earns $10,000.00 per week from two slot machines. The store keeps $5,000.00 and Orel keeps $5,000.00. This store has been a customer for seven years. Orel was impressed by how much money the CHS's slot machines earned considering it's the end of the month. Orel said no one makes money at the end of the month. Because of this, Orel expected big profits next month when people will be cashing their government checks in order to gamble on the machines. CHS brought up the idea of using the Rabbi to send money to Israel. Orel said he doesn't send his money overseas anymore, because he invests in U.S. real estate. He owns two apartment buildings in Oakland. One building has three rental units and the other has four units. The units rent for $1,600.00– $2,000.00 per month.

51.     *March 30, 2017 (not recorded)*: CHS contacted me to say that Levy was at the smoke shop to collect money owed to him from the slot machine. At approximately 1430 hours I responded to the business and observed Levy's white Nissan Pathfinder (7VKS589) parked in front. About 15 minutes later, I saw Levy exit the business and drive away. I later contacted the CHS who gave me a summary of their conversation which is detailed below:

52.     Levy recently got married to a social worker and is living in Concord, California. Yaniv gives him a salary of $4,000.00–$5,000.00 a month to work in the gambling business. Levy said there are two different Israeli groups operating slot machines in the Bay Area but theirs is the bigger group. There is also another group in Los Angeles that is their competition. Levy provided the CHS with his cellular telephone number: 415-745-6974.

53.     *April 13, 2017 (recorded)*: Levy said he obtained a new motherboard two days ago. He thinks that Orel will return from his trip this weekend. Levy said he was not there to collect money from the machines. He changed out the motherboard. He said there was just one game on the new motherboard, but it came with music. CHS sampled the new game.

54.     *April 26, 2017 (recorded)*: CHS complained that the Keno game was not working correctly and was paying out too many jackpots. CHS said he/she told Orel about it the last time

Page 16  AFFIDAVIT OF CHRISTIAN E. NORGAARD

he came to collect from the store. Levy took a phone call from Orel and they had a conversation in what sounded like Hebrew about the Keno game. Levy said that Orel would not be coming to the store today. Levy will be taking one of the three slot machines out of the store. The Keno machine lost over $1,000.00 and Levy said he would give CHS $700.00 in profits from the other two devices and pay the remaining $300.00 on the next visit. According to Levy, Orel gave CHS $280.00 the last time he was at the store but CHS did not agree. CHS placed a call to Orel to discuss the situation and then passed the phone to Levy and the conversation continued in what sounded like Hebrew. The call was concluded and Levy totaled the profit/loss for all three devices again. He said that CHS's numbers were off and Orel was mad.

55.     CHS was upset with the slot machine and asked Levy to remove it. Levy instead said he would fix it. CHS and Levy continue to disagree over what the money in versus the money out total number should be for the three devices. CHS asked if Levy had a different slot machine to install, and he replied not today. Levy then made another call to Orel and they again spoke in what sounded like Hebrew. The call concluded and Levy complained that Orel sent him to do his job and then yelled at him on the phone.

56.     Levy said that business at other stores that have video slot machines was good. He confirmed that the next time he comes he will need to pay CHS $281.00. CHS asked Levy when he could bring a new slot machine. Levy said that it depended on the type of device CHS wanted. CHS told Levy to bring a good one. They can be heard carrying out one of the slot machines and loading it into Levy's vehicle. Levy left the store shortly thereafter.

57.     _May 21, 2017 (recorded)_: Levy said that he spoke to Orel on CHS's behalf and that he (Orel) will come see CHS this week. Levy told Orel that CHS wanted a new gambling device in the business. Levy said that he is not the new boss but instead Orel just sends him to collect money when he (Orel) can't go. Levy said he only came to Sacramento to collect money from CHS today. He had other businesses to collect from but they were not in this area. CHS can then be heard paying Levy the balance of money that was owed.

58.   *May 31, 2017 (recorded)*:  CHS complained to Levy that one of the slot machines was not good.  Levy told CHS that the other device was good.  Levy said that one of the machines, "pay too much."  He then made a phone call and spoke in a foreign language, possibly Hebrew.  Levy concluded the call and told CHS that he was speaking to "Tony" (Yaniv Gohar). There was a problem with the motherboard causing the machine to pay out more money than it should, so he was going to change it out.  Levy said the total money made between both slot machines was $1,071.00 and that CHS owed him half of that amount.  CHS asked why Levy didn't text or call him/her to say that he was coming to collect from the machines so that s/he would be ready for him.  Levy said he was in Hayward and then was directed to go collect from CHS.  It wasn't planned for him to be in Sacramento or else he would've come earlier in the day. Levy said that Orel has been busy and that is why he hasn't come himself to collect from CHS. Levy indicated that Orel was out of the area for "family stuff," but when he returned he would come visit CHS.  Levy did not know when he would return, however.  Levy told CHS he would be back Friday (June 2, 2017) at 11:00 am to pick up the money he was owed.  CHS commented that Levy was acting like the boss and he responded, "I wish I was the boss, I wish."

59.   *June 2, 2017 (recorded)*:  Levy and CHS discussed a customer that had won a $500.00 jackpot.  Levy said the slot machines would not be paying out like that anymore.  Levy told CHS that he talked to Orel and that he would see CHS once he returned to the Bay Area. Levy confirmed that Orel's telephone number was 415-606-6052.

60.   Levy took an incoming call from Orel and passed the phone to CHS.  Some of their conversation can be heard on the recording made by CHS but much of what Orel said was inaudible.  CHS made a phone call to an employee of the smoke shop asking him to bring them food.  Levy talked about applying for his green card.  The employee returned to the store with food but Levy declined to eat.  The conversation turned toward the topic of green card applications, and Levy said his wife is a U.S. citizen.

61.   CHS counted out $500.00 but Levy said the amount owed was $553.00.  CHS

resisted and Levy complained that, "He's going to take it from my salary." CHS refused to pay him any more money and Levy relented. CHS told Levy he needed to be more flexible. Levy said that he only does what Orel tells him to do. CHS asked Levy why he couldn't wait to pick up the money until next week. Levy said that Orel "needs me to send him everything today." They talked about adding a third slot machine to the smoke shop. Levy said they don't have any businesses with three slot machines. Levy is too busy to go out on the weekend with CHS. He said that he works on Sundays.

62.     Before Levy left the smoke shop, Levy said he will or has made other collections today. CHS asked how Levy gets the money to Orel and he replied, "I put it in his business account." This claim is corroborated by surveillance I conducted in which Levy was observed depositing proceeds from the slot machines into a business account in Orel's name, as substantiated by banking records.

63.     _June 22, 2017 (recorded)_: Levy borrowed a piece of paper from CHS to write down the numbers from the slot machines. CHS cashed out a customer who was playing so that Levy could service the machine. Levy totaled up the profit from both devices and told the CHS ($1922.00). Levy subtracted $100.00 from that total for expenses, then divided that number in half. Levy told the CHS to pay him $911.00.

64.     _June 28, 2017 (recorded)_: After greeting each other, Orel walked over to the slot machines and can be seen servicing the devices. Orel told CHS that he was owed $500.00 from last time. Orel said that he came back from Southern California because Levy went to Israel for one month. Orel said he was staying at his brother's place in Berkeley and would be collecting from the machines while Levy was gone. (Yaniv currently resides in Berkeley). Orel can be seen totaling up the numbers from the slot machines on a piece of paper. Orel totaled up the numbers and said that the CHS owed him $1,350.00. CHS can be heard giving Orel money. CHS still owed $300.00 and said s/he would pay Orel next week.

65.     _July 7, 2017 (recorded)_: Orel said that his wife was acting crazy and asking him

to move down to Los Angeles.  He said he might move at the end of the month.  Orel said that the Rabbi is no longer available to help the CHS send money to Israel.  Orel said he stopped six months ago.  Orel said he stopped sending money this way because he is scared and has a lot to lose.  Orel did not have any alternative ways for CHS to send the money overseas.  CHS complained that Orel should have told him/her earlier that this wasn't an option.  Orel explained he just learned of this one month ago.  He said the Rabbi stopped 7–8 months ago.

66.     Orel now has a big problem because he has to leave his life here and go to the Southern California and live with his wife.  Orel said that his wife wants kids with him.  CHS reminded Orel that he had previously stated that she is a lesbian.  Orel said he doesn't care and would like to have two or three kids with her.  CHS complained about Levy not giving him/her advanced notice before showing up to the business to collect from the slot machines.  CHS asked Orel to install a third slot machine.  Orel said he would rather switch out the game of one of the existing slot machines.  CHS again asked Orel about his wife.  Orel said that at the beginning of their relationship it was "business," but that she has since fallen in love with him.  He wants to start a family.  Levy will take care of collecting from CHS with Yaniv backing him up.  Orel said he would come by once in a while as well.  Orel totaled up the profits for both slot machines.

67.     CHS complained about Levy and his business style.  Orel said that Levy pressures CHS for money because he's afraid of Yaniv.  If Levy doesn't have the right amount of money to give to Yaniv, he could get in trouble.  Orel said for him it's not a big deal because Yaniv is his brother.

68.     Orel said it was a good week for making money but told CHS s/he needs to push his/her customers to play more.  Orel said that he would send Levy to collect the money from CHS next Monday.

69.     _July 13, 2017 (recorded)_:  On this date, Orel and the CHS discussed paying out jackpots to customers who play the slot machines.  Orel said it is important to pay out jackpots because it leads to more gameplay.  Orel totaled up the numbers from both slot machines at

CHS's store and said they earned a combined profit of $3,079.00. Orel offered a $500 discount which made the split approximately $1,250.00 each. The CHS disputed these figures, and Orel offered to accept $1,100.00, considering the CHS offered to refer Orel to another store to install a slot machine. CHS is heard on the recording counting money.

70.    *July 26, 2017(recorded)*: CHS apologized to Orel for not driving to the Bay Area to deliver him money. Orel said it was okay. Orel said that he trusted CHS and that he doesn't treat any of his other customers the way he treats him/her. Orel doesn't let any other customers make late payments, only CHS. According to Orel, "I have more than 50, 60 machines I take care of, none of them, I get credit from." Orel can be heard servicing the slot machines. CHS complained about all of the violence that goes on near the business. Orel responded, "Bad area is good money." CHS then paid Orel the money he was owed. Orel told CHS, "People like you pay my salary." CHS asked Orel how he could trust Levy with all of that money. Orel replied, "Numbers, numbers. We go through the record. Computers." Orel said that every week he puts the new number taken from the slot machine into the computer. He then compares it to the number from the week before. Orel went on to say, "With the computer, it told me how much money is supposed to be in the machine. In, out, profit." Orel said that by recording the numbers on a weekly basis and entering them in the computer, he would be able to tell if a large amount of money went missing.

71.    *August 10, 2017 (recorded)*: Levy visited CHS at CHS's store to collect. He told CHS that the combined revenue from the slot machines was $3,168.00.

72.    *August 24, 2017 (recorded)*: CHS was not expecting Levy to come collect from the slot machines this day. CHS said s/he had two store locations that wanted slot machines and needed to give the information to Orel. Levy wanted CHS to give the addresses to him. CHS refused and directed Levy to have Orel come to his/her business next week, and s/he will show him (Orel) the locations. Levy protested and said, "I am the salesman." CHS told Levy that these business owners want to meet the boss not a salesman. Levy told CHS what each slot

Page 21 AFFIDAVIT OF CHRISTIAN E. NORGAARD

machine earned.  CHS paid Levy $300 but still owed him another $900.  CHS said s/he would pay Orel the rest when he came to the business next week.  Levy sounded annoyed when CHS again spoke about having the boss go meet these other store owners that wanted a slot machine. Levy said, "Give me some credit, I've been working this business 3 years...I give him hundreds of places."  Levy said he would see CHS next week and left the business.

73.     *August 30, 2017 (recorded):* Levy visited CHS at CHS's store to collect.  He told the CHS that the combined revenue from the machines was $2,816.00.

74.     *October 2, 2017 (recorded)*:  Yaniv and Orel visited CHS at his/her smoke shop. This meeting was audio and video recorded.  An FBI agent and I conducted surveillance outside the store and saw them enter and leave.  The meeting had been arranged by telephone the prior week, after CHS failed to pay what was owed to the organization.  The purpose of the meeting was to discuss two issues.  The first issue related to timely payment by CHS and, from CHS's perspective, the lack of notice given to the CHS prior to weekly collection visits.  The second issue related to the loss of two machines from CHS's store on August 30, 2017.  On this date, I and another Bureau of Gambling Control agent seized the two machines from CHS's store, with the CHS's prior knowledge.  As per my instructions, CHS reported to the Gohar Organization that the machines were stolen by a disgruntled ex-employee.  This staged burglary was intended to prompt a meeting with Yaniv and potentially to capture a recorded conversation about the illegal gambling business.

75.     During the meeting, Yaniv Gohar explained that he wanted CHS to make money from the video slot machines, but he also wanted to get his money on time.  Yaniv stated that the operation of the slot machine business required a lot of maintenance work and driving, so it was important that CHS made timely payments of the Organization's share of the earnings.  In response, CHS explained that s/he routinely removed the cash from the store because the neighborhood was dangerous.  CHS stated that he needed advance notice when the collector was coming, so s/he could bring it to the store.  They discussed the problem and some ideas to

resolve it. CHS paid the $1,100.00 he owed in cash directly to Yaniv. Yaniv said he didn't want $20 dollar bills. They agreed to continue with their business arrangement. Yaniv said he would show CHS how to make $4,000.00 a week with the machines, and stated that $1,500 was nothing.

76.     *November 2, 2017 (recorded)*: Orel visited CHS's smoke shop. CHS said s/he was in the process of selling the smoke shop and buying two additional ones. When that happens, s/he wants two slot machines at each location. CHS would assist the new owner (of the current smoke shop) with the transition and introduce him to Orel so they could continue with the slot machines. Orel totaled up the profits for the each slot machine and told the CHS to pay him $500.00. They discussed Levy's trip to Israel and CHS traveling to San Francisco to eat sushi with Orel and Yaniv. CHS confirmed that s/he didn't owe any more money, and then Orel left the business.

**E. Physical Surveillance of the Gohar Organization**

77.     Investigators conducted physical surveillance of Yaniv Gohar, Orel Gohar, May Levy, and Eran Buhbut. This surveillance met several objectives. It confirmed their residences, identified other locations relevant to this investigation, and further revealed their participation in the illegal gambling business, to include their association with one another. Set forth below are summaries of this surveillance.

78.     *October 8, 2015*: Special Agents with the BGC conducted surveillance of Orel in Sacramento and San Joaquin County. During the operation, Orel was observed visiting several liquor stores, smoke shops, and other small retail stores. I confirmed that all but one of these locations had illegal video slot machines on their premises. The lone exception was a pool hall; however, a neighboring smoke shop called "CigMo Food & Cigarettes" did have a slot machine.

79.     *January 14, 2016*: I set up surveillance at "CigMo Food & Cigarettes," 7298 Franklin Boulevard, Suite E, Sacramento, California, where I had observed an illegal video slot machine on October 8, 2015. I was expecting Orel to come that day to collect money from the

Page 23  AFFIDAVIT OF CHRISTIAN E. NORGAARD

machine. (Past surveillances showed that Orel routinely traveled to Sacramento County on Thursdays). At approximately 1149 hours, Orel parked his vehicle in the lot and walked inside the business. I activated my video recorder and followed him into the store. Below is a synopsis of what I observed while inside:

80.     I walked to the back of the store to where I knew the slot machine was located and saw Orel using a key to open the front panel. The store employee, an Asian male adult (AMA), who was at the front counter when I entered, walked to the back. Orel handed him a plastic bag filled with unknown items, which I suspected to be currency. The store employee then walked back to the front of the store. Orel also walked toward the front of the store, and the video captured the slot machine with the front panel open and the wiring exposed. Orel returned to the machine and appeared to be servicing it. At one point he closed and locked the front panel and turned to leave before re-opening the front panel with a key and started to work on it again. Orel finished and walked behind the counter and up to the register to where the store employee was standing. I could see what appeared to be different "fruits" in three lines spinning vertically on the video screen of the gambling device, just like a slot machine in a casino would do. I observed Orel hand the employee a small piece of white paper with writing and point to it while saying "that is the out." (Based on my training and experience, these slot machines record money coming "in" and money going "out," and collectors typically write the weekly totals down when making their collections). I then saw the employee reach down under the counter and grab what appeared to be a folded wad of currency. He then discreetly passed the money from the palm of his hand to the palm of Orel's, as if he was trying to conceal his actions from the other customers in the store. Orel then walked around to the front of the counter, grabbed a "Jolly Rancher" candy from next to the register, and told the employee, "See you next time."

81.     *August 18, 2016*: The CI at 2255 Alum Rock Avenue, San Jose, California notified me that Eran Buhbut came to CI's business that morning to collect from an illegal slot machine. They each made $51.00 on profits from the slot machine. Later that night, I traveled

Page 24  AFFIDAVIT OF CHRISTIAN E. NORGAARD

to Buhbut's address of record, 1530 6th Avenue, #14, Oakland, California. At approximately 2015 hours, I observed Buhbut standing in the breezeway of the apartment building while conversing in what sounded like Hebrew with an unidentified WMA, who was standing outside on the sidewalk. The WMA later entered a white Dodge SUV, California license plate number 7FMT306 (R/O: Shay Benyishay, 6825 Stockton Avenue, El Cerrito). The vehicle had advertising on the side for a 24-hour locksmith.

84. At approximately 2025 hours, I observed Buhbut drive out of the apartment complex in a black BMW SUV, California license plate number 6XGZ021 (R/O: Eran Buhbut, 1530 6th Avenue #14, Oakland, California). This was the same vehicle that I observed parked in front of Yaniv's house in Berkeley, California on May 30, 2017.

83. *February 9, 2017*: I set up surveillance at Florin Cigarettes, 6519 Savings Place, Sacramento, California. At approximately 1232 hours, I saw a white Nissan Pathfinder, California license plate 7VKS589 (R/O: May Mordechay LEVY, 588 Sutter Street #304, San Francisco), back into a stall right in front of the business. I observed Orel and Levy remove a video slot machine from the back of the vehicle and carry it inside the business (CHS later confirmed that Orel and Levy installed a new slot machine that day).

84. *March 3, 2017*: On this day, the CHS provided me with items s/he found inside the Nissan Pathfinder that s/he purchased from Yaniv and Orel Gohar on February 27, 2017. Among these items was a purple, spiral-bound notebook containing English and Hebrew handwriting. The FBI later translated the Hebrew writing. The notebook contains the addresses and contact information of several businesses and notes related to interactions with those businesses. The notes indicate in several instances whether the location had adequate space, whether the owner was in at the time of the call, and/or whether they wanted or did not want the item/service. Based on the contents of this notebook and where it was found, it is apparent that the Gohar Organization seeks new locations to place illegal video slot machines and documents its work in doing so.

85. *March 29, 2017*: I observed Orel park his white Lexus SUV with paper plates in front of Florin Cigarettes before walking inside the business. (An audio recording made by CHS confirmed that Orel was there to collect money from the slot machines.) I conducted a DMV query for vehicles registered to Orel. The result of that query showed he had a Lexus SUV with assigned California license plate number 7WGR483 registered to the following address: 88 Howard Street #1709, San Francisco, California.

86. *April 25, 2017*: I traveled to the Park Regency Apartments, 3146 Oak Road, Walnut Creek, Levy's address of record (#419). I observed Levy's white Nissan Pathfinder (7VKS589) parked on the northeast side of the complex.

87. *May 30, 2017*: I was contacted by the CI that owns the previously cited business at 2255 Alum Rock Avenue, San Jose, California. The Gohar Organization had two video slot machines located inside the business. The CI told me that Buhbut had been by the business that morning to collect money from the devices.

88. At approximately 1830 hours, I traveled to 1821 Chestnut Street, Berkeley, California, the residence of Yaniv. I observed Orel's white 2017 Lexus RX350 with paper plates parked directly in front of the house. Parked behind the white Lexus was a 2001 black BMW X5 (6XGZ021) that was registered to Buhbut.

89. *June 28, 2017*: At approximately 1130 hours, I set up surveillance at Florin Cigarettes in South Sacramento, California. A short while later, I observed Orel park his white Lexus SUV in front of the business and walk inside in order to collect money from slot machines located there. (A video recording made by CHS confirmed that Orel collected money from the slot machines).

90. Later that day CHS texted me a photo of a Vehicle Identification Number (VIN) that s/he said was taken from Orel's white Lexus SUV. (There were still dealer paper plates on the vehicle). I conducted a DMV query of the VIN (2T2BZMCAXHC066000) and found that it came back to Orel Gohar, 88 Howard Street #1709, San Francisco, California.

Page 26  AFFIDAVIT OF CHRISTIAN E. NORGAARD

91.  *August 17, 2017*: I set up surveillance at Famous Smoke Shop, 3022 Stockton Boulevard, Sacramento, California, where the Gohar Organization had placed a video slot machine.  At approximately 1157 hours, I observed Levy park his white Nissan Pathfinder (7VKS589) on the west side of the lot before walking into the business.  A few minutes later, the store manager, Wes Huang, contacted me via text and advised that Levy was there collecting money from the two slot machines that were located inside.  Huang later told me that Levy gave him $320.00 that was removed from the machines and kept the rest.

92.  At approximately 1231 hours, I followed Levy to 7298 Franklin Boulevard, Sacramento, California.  I briefly lost sight of Levy but assumed he went into CigMo, a business that I knew previously had an illegal slot machine inside.

93.  At approximately 1316 hours, I observed Levy park in front of Mega Mart, 5050 Fruitridge Road, Sacramento, California before walking inside (I later confirmed that there was an illegal slot machine located inside).

94.  At approximately 1326 hours, I observed LEVY park and enter the smoke shop managed by the CHS.  CHS contacted me shortly thereafter to say that a store employee called him/her and said that Levy was there to collect the money.  CHS got on the phone with Levy and told him that the store employee would pay him $300.00 now and that CHS would drive to the Bay Area in a few days and pay Orel the rest directly.

95.  At approximately 1415 hours, I observed Levy park and walk into Chase Bank, 4450 Florin Road, Sacramento, California.  I followed Levy inside and saw him at a window conversing with a female bank teller.  I could hear a sound I recognized as a currency counter being used.  I followed Levy out after the transaction and observed him drive to another part of the parking lot before entering Walmart, 6051 Florin Road, Sacramento, California.

96.  At this point, I discontinued my surveillance of Levy and returned to Chase Bank where I contacted Aman Shergill, Branch Manager.  I identified myself with my law enforcement credentials and asked Mr. Shergill for details related to the Levy transaction.  I was

Page 27  AFFIDAVIT OF CHRISTIAN E. NORGAARD

told that Levy made a cash deposit into a business account operated by Orel Gohar.  I advised Mr. Shergill that I would return with a subpoena to obtain the specifics related to this transaction.

97.     *September 11, 2017*:  FBI agents conducted surveillance of Yaniv Gohar at his residence located at 1821 Chestnut Street, Berkeley.  During the surveillance, Yaniv was observed arriving at his house driving a black Porsche Panamera with paper plates. (A California DMV records query showed that YANIV has a 2017 Porsche, California license plate number 8ACY758, registered to him at 588 Sutter Street #304, San Francisco).

98.     *September 14, 2017*:  FBI agents conducted surveillance of Yaniv at his residence. Orel was seen arriving at the house driving the white Lexus SUV with paper plates.  He walked up to the front door and then around the side yard before going out of view.  Yaniv, Orel, an unidentified White female adult (WFA) and an unidentified White male adult (WMA) were later seen traveling together to Livermore.

99.     *October 2, 2017*:  I observed Orel and Yaniv visit Florin Cigarettes in South Sacramento to meet with the CHS.  They arrived in a white Chevy Tahoe.  The CHS recorded the meeting.  As described earlier in this affidavit, they discussed the illegal gambling business.

100.    *October 23, 2017*:  FBI agents followed Buhbut from his home at 1530 6th Avenue #14, Oakland, California to Derrel's Mini Storage, 5019 Tunson Road, Modesto, California where he met with a WMA, later identified as Eyal Cohen, outside of a storage unit. Cohen left his rental car at the storage location and got into the passenger seat of Buhbut's Isuzu SUV, California license plate number 6XZK041 (R/O: Eran Buhbut, 1530 6th Avenue #14, Oakland, CA).  They drove to One Stop Gasoline at 5913 McHenry Avenue, Modesto, California where Buhbut worked on a machine similar in appearance to a video poker type gaming machine near the front counter.

101.    *October 25, 2017*:  FBI agents followed Buhbut away from his apartment to 836 7th Avenue, Oakland, where he was seen contacting an individual who appeared to be working on a remodel of that location.  This duplex is owned by Yaniv.

Page 28  AFFIDAVIT OF CHRISTIAN E. NORGAARD

102.    Buhbut was later followed to El Catrin Bar, 2255 Alum Rock Avenue and Quick Buy Market, 1815 Alum Rock Avenue #A, both in the city of San Jose, California. FBI agents were able to verify that a video slot machine was located inside both of these businesses. After visiting these locations, Buhbut appeared to have car trouble and used an apparent ride-sharing service to return to his residence.

103.    _November 2, 2017_: At approximately 1240 hours, Wes Huang advised me that Orel was at Famous Smoke Shop in Sacramento, California to collect money related to the illegal slot machines. He collected from one machine, but a customer was playing on the other, so he told Huang that he would come back later. At approximately 1420 hours, Huang reported that Orel had returned to Famous Smoke Shop. Huang said Orel gave him $360 from the illegal slot machine proceeds before leaving the store.

104.    _November 15, 2017_: I observed Yaniv's black Porsche Panamera parked in the driveway of his residence at 1821 Chestnut Street, Berkeley, California. The garage door was up. I also saw the white Chevy Tahoe with paper plates that is associated with Yaniv parked in front of the house.

105.    _November 16, 2017_: Wes Huang contacted me and said that Levy was at Famous Smoke Shop to collect money and fix one of the video slot machines. He said Levy drove a blue Toyota Highlander, California license plate number 7LEP139 (R/O: May Mordechay LEVY, 3146 Oak Road #419, Walnut Creek, California).

106.    That same evening I set up surveillance of the Park Regency Apartments, 3146 Oak Road, Walnut Creek, California. At approximately 1716 hours, I saw Levy drive out of the complex in the blue Toyota Highlander. I followed him to the Ygnacio Animal Hospital, 941 Ygnacio Valley Road, Walnut Creek, before I discontinued surveillance.

107.    I then returned to the Park Regency Apartment complex. At approximately 1800 hours, I saw Levy drive back into the complex. I could see a small dog sitting on his lap as he drove past. I walked upstairs to #419 but did not see him, and there were no lights on inside the

apartment. I later observed Levy and the dog outside of the apartment building. A few moments later, I heard Levy run up four flights of stairs. I could hear a door open and close in the area of his apartment unit. I then walked upstairs and observed lights on inside of #419. I located Levy's vehicle parked in section "P-1" of tenant parking. I discontinued surveillance of Levy shortly thereafter.

108.   *November 21, 2017*: At approximately 0845 hours, I traveled to Orel's address of record, 88 Howard Street #1709, San Francisco, California. I went to the basement of the building (P2) and saw Orel's white Lexus SUV parked in space #2261.

109.   At approximately 1050 hours, I observed Buhbut walk from the area of 1530 6th Avenue, Oakland, California and get into a black Kia SUV, Oregon license plate 349JFN (R/O: PV Holding Corp) and drive away. (PV Holding Corp is a rental car company also known as the Avis Budget Group.) I contacted Avis and learned that Buhbut had rented the vehicle in Oakland on October 30, 2017. He listed the 6th Avenue address with unit #14 as his current address.

F.   **Review of Telephone Activity**

110.   Yaniv Gohar's mobile telephone number is 917-748-4848. The Verizon Wireless subscriber for this number is "Yaniv Gonar" at 588 Sutter Street #304, San Francisco, California. This is the address of record for Yaniv's business, United Home SF, Inc. This phone number appears as Yaniv's contact number for his email account, yanivgohar@gmail.com, the Comcast Internet account at his residence, 1821 Chestnut Street, Berkeley, California, his Wells Fargo Bank accounts, his JPMorgan Chase Bank accounts, and other records associated with him.

111.   On May 15, 2017, the government obtained a court order authorizing the installation and use of pen registers and trap and trace devices on telephone number 917-748-4848. On May 16, 2017, the FBI began collecting call activity data from Yaniv's number. Subsequent renewals have allowed the FBI to capture Yaniv's call activity from May 16, 2017–November 22, 2017. As summarized below, call activity within this time period reveals frequent

contact between Yaniv's phone and the following numbers attributed to other individuals in this investigation.

| Phone Number | User | # of Contacts | Rank Order (of most called #s) |
|---|---|---|---|
| 415-416-9084 | Orel Gohar | 964 | 1st |
| 714-878-6223 | Eran Buhbut | 408 | 2nd |
| 415-686-7865 | May Levy | 109 | 8th |

112.   _415-416-9804_: This is Orel Gohar's AT&T mobile telephone number. He is listed as the subscriber at his current address, 88 Howard St Apt 1709, San Francisco, California. This number is associated with Orel's email account, orel1gohar@gmail.com, the Comcast Internet account at his residence, one of his Wells Fargo Bank accounts, and his credit application at Lexus of Concord for the lease of his 2017 Lexus SUV.

113.   _714-878-6223_: This number appears in Eran Buhbut's U.S. immigration file as his contact number.

114.   _415-686-7865_: This is May Levy's AT&T mobile telephone number. It appears in Levy's U.S. immigration file as his contact number. It also appears in Western Union records as Levy's contact number.

G.  **Review of Email Accounts**

115.   On June 20, 2017, the government obtained a federal search warrant ordering Google Inc. to produce records for the email accounts yanivgohar@gmail.com and orel1gohar@gmail.com. On September 11, 2017, Google provided records for these accounts. The subscriber of the former is identified as "Yaniv Gohar" with telephone number, 917-748-4848. The subscriber of the latter is identified as "Orel Goahr" with telephone number, 415-416-9804. These phone numbers are known to belong to Yaniv Gohar and Orel Gohar, respectively. Additionally, the content of emails from the two accounts made it clear that these accounts

belong to Yaniv Gohar and Orel Gohar.  For example, an email sent from
yanivgohar@gmail.com on October 4, 2016 contained a photo of Yaniv Gohar's social security
card, and an email sent on May 1, 2017 included a photo of Yaniv Gohar.  An email sent from
orel1gohar@gmail.com on May 13, 2015 included a photo of Orel Gohar's California driver's
license, and an email dated March 6, 2017 attached a copy of a 1099-MISC tax document
showing compensation to Orel Gohar, who is identified by his social security number.

116.    Emails for the above accounts include evidence of the Gohars' involvement in
illegal gambling and making false statements.  From November 29, 2012–July 17, 2013, Yaniv
exchanged emails with an individual using the account, natulya76@yahoo.com.  The name that
appeared alongside this email address is Natalia Zatserkovnaya.  As described in detail below,
the emails describe an internet café called iFun that Zatserkovnaya set up in her name, apparently
under Yaniv's direction and supervision.  As evidenced by the facts below, this internet café
appeared to be a business that operated or intended to operate casino-style games through
computers connected to the internet.  These cafés often represent their operations as sweepstakes
rather than gambling in an effort to appear legitimate.

117.    On November 29, 2012, Zatserkovnaya forwarded two emails to Yaniv from Mai
Trinh of Vu Management Incorporated asking "Tony" (Yaniv's known alias) to fill out a lease
application.  Attached to the email was a letter of intent to lease a property in San Jose,
California.  On December 6, 2012, Zatserkovnaya forwarded an email from Moment Printing
containing a "Grand Opening" poster for iFun and requesting approval of the design.  The poster
includes images of numerous $100 dollar bills and dollar signs.  On December 22, 2012, she
forwarded an email from Bob Webb at Netsweeps Games (netsweepsgames.com) attaching
account information and requesting review of a point-of-sale video.  As of November 14, 2017,
the Facebook page for Netsweeps Games, which includes a link to the above website, describes
Netsweeps Games as a "manufacturer of cutting edge internet sweepstakes software" that
provides "individuals and business owners with the ability to set up their own sweepstakes

contests and sweepstakes internet cafes." Photos posted to the site appear to depict casino-style video slot games.

118.   Beginning on January 24, 2013, Zatserkovnaya asked Yaniv to take a number of steps to remove the business from her name. She stated, "I need you to transfer business (iFUN) license and all liabilities ASAP, as you guys operating under my name and that is definitely not fine with me." She added, "As per our conversation of the amount you should pay me for the time I worked for you with no pay, let's figure it out. First of all you should take care of taxes that i have to pay on $50,000 you withdrew through my accounts, as I said before it would be considered my income, as far as I know taxes on the amount up to $45,000 is 10% and higher afterwords, but you can double check." On January 27, 2013, she sent a follow-up email to which Yaniv responded the following day, writing "I'm trying to find some one to take the business over or to buy it form me! Anyway ill lets u know by this week."

119.   On February 6, 2013, Zatserkovnaya sent an email to Yaniv advising that she closed the iFun business located at 962 East Santa Clara Street, San Jose, California. She added, "Thank you for helping me make up my mind as after our yesterday's conversation when you threatened to send someone after my son..."

120.   Aside from revealing his involvement in the above-described internet café, Yaniv's emails also connect him to the video slot machine business that is the focus of this investigation. On August 21, 2015, Yaniv received an email from info@nsdny.com. The email was also sent to equitycapny@gmail.com. The email contained a screenshot of a mobile phone contact page for the contact name, "Yaniv Gohar, Dumpsters Inc." It shows Yaniv's mobile telephone number, 917-748-4848, which was discussed earlier in this affidavit. It also shows his work number as 917-795-5727. As described below, this latter number further links Yaniv to the illegal gambling activity in this investigation.

121.   As cited earlier in this affidavit, on February 27, 2017, CHS traveled to Berkeley, California to purchase from Yaniv and Orel Gohar a 2002 Nissan Pathfinder with California

Page 33  AFFIDAVIT OF CHRISTIAN E. NORGAARD

license plate number 7RUR101, formerly registered to May Levy. Sometime after completing the purchase, a member of CHS's family discovered a LG 450 mobile telephone inside the car. Pursuant to a federal search warrant, the FBI performed a digital forensic examination of the phone. The phone's call log shows contact with telephone numbers: 415-606-6052, 415-745-6974, and 415-947-9712. The first two numbers were used by Orel and Levy, respectively, to communicate with people involved in the gambling business, including the CHS. The last number is the number Buhbut gave to the CI on June 8, 2016. Text messages stored in the phone reference machines, credit, keys, and other language indicative of the slot machine business. In these messages, the phone's user is addressed as "Tony," Yaniv's known alias. A message dated May 23 (the year was not shown) references La Rosa Meat Market, 1521 Sacramento Ave, West Sacramento, California. The significance of this location is explained below.

122.    Orel Gohar's emails also provide evidence of his involvement in illegal gambling. From approximately May 10, 2015–July 5, 2016, Orel sent or received over a dozen emails containing lists of addresses in Northern California. Accompanying some of these addresses are labels such as "smoke shop," "liquor store," or "gas station," the kinds of businesses commonly involved in the illegal slot machine business. During the course of this investigation, I saw video slot machines at several of the locations listed in Orel's emails. One of the listed addresses is 1521 Sacramento Ave, West Sacramento, California (La Rosa Meat Market), which appears in a text message in the above-referenced mobile phone associated with Yaniv. In 2017, I observed the presence of an illegal slot machine at La Rosa Meat Market.

123.    In addition to revealing his involvement in illegal gambling, Orel's emails also provide evidence of false statements, potentially related to money laundering of the gambling proceeds. On April 14, 2015, he sent an email to southshore@prometheusreg.org. This domain appears to belong to the Southshore Apartments in Alameda, California. The email contains an image of a paystub (Check #13627) from Evergreen, Inc. for Orel Gohar for the pay period ending in January 31, 2015. It shows $7,000 in wages and $2,352.67 in taxes. This contradicts

Page 34  AFFIDAVIT OF CHRISTIAN E. NORGAARD

California Employment Development (EDD) records from January 2013 through December 2016 that show no reported wages for Orel Gohar.

124.    A similar fraudulent pay stub was found among Yaniv's emails. On January 7, 2015, he forwarded an email from Eran Arkin to orel_gohar@walls.com.il. Attached were paystubs from "Evergreen" dated November 30, 2014 and December 31, 2014. The former showed $7,000 in monthly and $77,000 in year-to-date wages, and the latter showed $84,000 in year-to-date wages. Again, these wages do not match California EDD records.

125.    Eran Arkin appears to be a source of fraudulent documents for the Gohars. On January 8, 2015, he sent an email to Yaniv entitled, "Check spelling and everything." Attached to the email was a December 2014 statement for Chase Bank account ending in 9617 in the name of Orel Gohar. The statement shows a beginning balance of $71,761.48, deposits of $98,972.94, and checks paid totaling $163,687.40. On December 17, 2015, I reviewed Orel's application to rent an apartment at his former residence, the Dunes Apartments, 2445 Shoreline Drive, Alameda, California. In his application dated January 13, 2015, Orel stated that he was an "area manager" working for "Eran" at 865 Market Street, San Francisco, California. Along with the application, Orel provided the first page of the above Chase Bank statement, presumably to show sufficient income to cover future rents.

126.    On June 22, 2016, a federal grand jury subpoena was issued to JPMorgan Chase Bank requesting records from January 1, 2013 to present for any Orel Gohar accounts. The bank's production did not include the above statement. Based on the bank's response, and that Orel received the statement from Eran Arkin, it appears the statement is not authentic.

H. **Review of Banking Activity**

127.    The subjects' banking activity reveals numerous large deposits from businesses, as well as several deposited money orders. A significant portion of these funds has been used to purchase residential and commercial real estate in Oakland, California. Based on subjects' statements to the CHS, this activity appears to be a product of revenue generated by the illegal

Page 35  AFFIDAVIT OF CHRISTIAN E. NORGAARD

gambling business and evidence of potential money laundering.

128.   _May Levy_:  As described earlier in this affidavit, on August 17, 2017, I conducted surveillance of May Levy.  Levy visited several stores in the Sacramento, California area, including CHS's store and another store that has a slot machine controlled by the subjects.  After visiting these stores, Levy entered a Chase Bank branch at 4450 Florin Road, Sacramento, California and appeared to conduct a cash transaction with a teller.  After the transaction was completed and Levy had left the branch, I contacted the branch manager to inquire about this transaction.  The branch manager advised that Levy made a cash deposit into a business account associated with Orel Gohar.  He did not provide the account information.

129.   Shortly after the above transaction, a subpoena was served on JPMorgan Chase Bank to obtain records for the transaction and the deposit account.  In November 2017, the bank provided its response.  The bank records show Orel opened a business checking account at JPMorgan Chase Bank on August 15, 2017 entitled, "Or Go & Sales, Inc."  (California Secretary of State records show that Orel Gohar is the registered agent of Or Go & Sales, Inc., which was registered in the State of California on August 1, 2017.)  The address on the bank account is Orel's residence, 88 Howard Street #1709, San Francisco, California.  The only activity on the account on August 17, 2017 was a deposit of $1,950.00.  This deposit appears to be consistent with Levy's statement to CHS on June 2, 2017, that he deposits money collected from the gambling machines into Orel Gohar's business account.  Based on bank records, there were two subsequent deposits of $3,710.00 and $9,000.00 on August 28, 2017 and August 31, 2017, respectively.

130.   _Yaniv Gohar_:  Yaniv's personal account number ending in 9869 was funded to a large degree by electronic transfers from Adam Atari, Attic Masters, and Evergreen Home Services.  California Secretary of State records show that Atari is the registered agent of Attic Masters and Evergreen Home Services.  From approximately September 2015 through March 2017, this account received the following incoming transfers from these entities:

Page 36  AFFIDAVIT OF CHRISTIAN E. NORGAARD

| Company/Person | # of Transfers | Amount of Transfers |
|---|---|---|
| Adam Atari | 15 | $54,700 |
| Attic Masters | 8 | $23,674 |
| Evergreen Home Services | 5 | $12,900 |
| Total | 28 | $91,274 |

131.    Similarly, the JPMorgan Chase Bank account for Yaniv's business, United Home
SF Inc., also received significant funding from Atari and his businesses. California Secretary of
State records show Yaniv Gohar is the president of United Home SF Inc., which was formed on
January 7, 2014. From approximately April 2016 through March 2017, United Home SF Inc.
account number ending in 1536, for which Yaniv Gohar is the sole signatory, received 104
incoming transfers totaling $260,540 from Adam Atari, Attic Masters, and Evergreen Home
Services:

| Company/Person | # of Transfers | Amount of Transfers |
|---|---|---|
| Adam Atari | 17 | $27,050 |
| Attic Masters | 62 | $179,590 |
| Evergreen Home Services | 25 | $53,900 |
| Total | 104 | $260,540 |

132.    Yaniv Gohar's JPMorgan Chase accounts show large outgoing payments to title
companies. From his personal account 9869, on November 3, 2015, there was a $74,344 wire
transfer to Old Republic Title. On December 11, 2015, there was a $37,000 wire transfer to First
American Title, and on February 1, 2017, there was a $67,000 wire transfer to Old Republic
Title. From his business account, on December 9, 2016, there was a $10,400 wire transfer to Old
Republic Title. Title company records indicate that these transactions were escrow payments

Page 37  AFFIDAVIT OF CHRISTIAN E. NORGAARD

toward the purchase by Yaniv Gohar or United Home SF Inc. of Yaniv's three properties: 1) 2040 Solano Way, Oakland, California; 2) 832-836 7th Avenue, Oakland, California; and 3) 925 East 11th Street, Oakland, California.

133.    Yaniv's United Home SF, Inc. Wells Fargo Bank account ending in 0912 also received significant funding from Atari's businesses.  From approximately January 20, 2015 – February 5, 2016, this account received the following deposited checks from Atari's businesses:

| Company/Person | # of Checks | Amount of Checks |
|----------------|-------------|------------------|
| Attic Masters | 2 | $7,750 |
| Evergreen Home Services | 24 | $72,460 |
| Total | 26 | $80,210 |

134.    Yaniv's personal Wells Fargo Bank account ending in 1259 was funded primarily by approximately $140,000 in transfers from Yaniv's other Wells Fargo Bank accounts, including $62,700 from account 0912.  Funds left the account primarily through two large wire transfers to Old Republic Title Company—a $15,000 transfer on August 12, 2015 and a $129,000 transfer on November 2, 2015.  Both were used to fund the purchase of Yaniv's warehouse property at 2040 Solano Way, Oakland, California.

135.    *Orel Gohar*:  Orel Gohar's personal JPMorgan Chase account ending in 5759 also received suspicious deposits.  From approximately January 2017 through April 2017, his account received seven deposited checks from ABA Cosmetics, LLC totaling $43,300.  The memo lines from some of these checks reference training and consultation work.  According to California Secretary of State records, Atir Dadon registered this company on June 3, 2016.  The address associated with this business is 865 Market Street, San Francisco, California, the same address Orel wrote on his Dunes Apartments application for his purported employer, "Eran."

136.    Orel's Wells Fargo Bank account ending in 5921, for which activity was

Page 38  AFFIDAVIT OF CHRISTIAN E. NORGAARD

examined from approximately December 2015 through March 2017, showed similar activity. The account was funded primarily by $14,405 in cash deposits and 62 Western Union money orders totaling $25,636. The money orders are consistent with a recorded statement Orel made to the CHS on March 8, 2017. CHS asked what Orel did with all the cash from the machines. Orel responded that he gives it to a partner who purchases money orders.

137.    Also funding Orel's Wells Fargo Bank account were seven checks totaling $34,100 from ABA Cosmetics. The memos on the ABA Cosmetics checks suggest Orel conducted training and motivational work for this company. Funds left the account for apparent personal expenses and through two large withdrawals. A $9,291.58 withdrawal on March 16, 2017 corresponds to a deposit into one of Orel's JPMorgan Chase Bank accounts. On December 8, 2016, he purchased a $30,000 cashier's check which was deposited the following day into Yaniv Gohar's Wells Fargo Bank account ending in 0820. This sum partially funded a $66,304 wire transfer on February 1, 2017 to Old Republic Title which was applied toward the purchase of property at 925 East 11th Street, Oakland, California. These transactions are consistent with Orel's statement to the CHS on March 29, 2017 that, rather than sending money overseas, he invests in U.S. real estate, including rental property in Oakland.

I.    **Review of Yaniv Gohar's Mortgage Applications**

138.    On or about December 10, 2015, Yaniv Gohar completed a mortgage application with Velocity Commercial Capital to purchase a warehouse property he now owns at 2040 Solano Way, Oakland, California. In the application, Yaniv stated that he earned $8,000.00 per month as a subcontractor for Evergreen located at 4445 Mammoth Ave, Sherman Oaks, California. This address is associated with Adam Atari, who is the registered agent of Evergreen Home Services.

139.    On or about December 15, 2016, Yaniv Gohar completed a mortgage application with OCMBC, Inc. to purchase a property he now owns at 925 E. 11th Street, Oakland, California. In the application he indicated that he was self-employed as the owner of United

Page 39  AFFIDAVIT OF CHRISTIAN E. NORGAARD

Home SF Inc., from which he earned $12,012 per month. On or about January 31, 2017, he signed a "Borrower's Certification and Authorization" related to this loan application in which he indicated that he made no misrepresentations.

140.    As part of the application, Yaniv authored a letter referencing "RE: Credit Inquiry Letter," in which he explained that the $30,000 deposited into his Wells Fargo Bank account ending in 0820 on December 9, 2016 was for "a job that I completed and they paid me with a cashier's check." In an apparent effort to support this statement, Yaniv provided an invoice from his company, United Home SF Inc. dated December 5, 2016 describing charges totaling exactly $30,000 for customer "Barry Goldman." The customer's address or contact information does not appear on this invoice. Yaniv also provided a United Home SF Inc. invoice dated January 30, 2017 describing charges totaling $50,000 for customer "Mr and Mrs Fisher," no address provided.

141.    Bank records for Yaniv and Orel Gohar suggest that the above invoices are likely fraudulent. The above-referenced $30,000 cashier's check was actually purchased by Orel Gohar with funds from his Wells Fargo Bank account ending in 5921. Orel's account had been funded primarily by Western Union money orders and checks from ABA Cosmetics, LLC.

142.    The above-referenced $50,000 invoice corresponds to a $50,000 check deposited into Yaniv's JPMorgan Chase Bank account ending in 1536. The check originated from a JPMorgan Chase Bank account belonging to 172 Wilson Ave LLC, a business located in Brooklyn, NY.

143.    In his Velocity Commercial Capital mortgage application, Yaniv claimed to be a sub-contractor for Evergreen, a company associated with Adam Atari. Atari and his companies are the primary source of funds going into Yaniv's bank accounts. The movement of funds from Atari to Yaniv appears consistent with subcontract work in that a contractor receives payment from the customer and directs a portion of this payment to its subcontractors. However, the OCMBC records present a different scenario. Yaniv claims his employment income is from his

Page 40  AFFIDAVIT OF CHRISTIAN E. NORGAARD

company, United Home SF Inc. and not as a subcontractor for Atari. The invoices Yaniv

provided to OCMBC also seem to represent the idea that Yaniv's company is not a subcontractor

but rather a contractor that receives payment directly from the customer.

### Request for Sealing

I respectfully request that this Court issue an order sealing, until further order of the

Court, all papers submitted in support of this application. I believe that sealing these documents

is necessary because the information contained herein relates to an ongoing investigation by the

FBI into illegal gambling and potentially money laundering and loan application fraud. All of

the participants have not yet been identified. Premature disclosure of the contents of this

affidavit and related documents may have a significant and negative impact on the continuing

investigation and may severely jeopardize its effectiveness.

### CONCLUSION

Based on the foregoing, there is probable cause to believe that Yaniv Gohar, Orel Gohar,

May Levy, and Eran Buhbut have been operating in an illegal gambling business in violation of

18 U.S.C. § 1955, predicated on their violation of California Penal Code § 330b. This business

remained in substantially continuous operation for over thirty days as evidenced by the dates of

the above-described surveillances, the recordings described above, and the reporting from Wes

Huang, the CI, and the CHS. Based on this investigation, the business was active from at least

September 10, 2015, when I first observed a video slot machine at Famous Smoke Shop, through

at least November 29, 2017, when May Levy collected at Famous Smoke Shop. The business

involved at least five persons, including Yaniv Gohar, Orel Gohar, May Levy, Eran Buhbut, the

CI, the CHS, Wes Huang, the owner or operator of One Stop Gasoline (where Buhbut worked on

a video slot machine), and several other business owners/managers where the subjects have

placed video slot machines. The business generated at least $2,000.00 on a single day as

evidenced by Orel's visit to the CHS's store on July 13, 2017. On this date, Orel calculated the

revenue of the two slot machines at the CHS's store since the last collection and reported it to the

Page 41  AFFIDAVIT OF CHRISTIAN E. NORGAARD

CHS as $3,079.00. Similarly, on August 10, 2017 and August 30, 2017, Levy reported revenues from the CHS's store of $3,168.00 and $2,816.00, respectively. Given that the Gohar Organization operates many dozens of machines, it is fair to conclude that the Organization's operations generate in excess of $2,000 on a typical day.

Christian E. Norgaard
Special Agent
California Department of Justice

Read and approved as to form.

Matthew M. Yelovich
Assistant United States Attorney

Subscribed and sworn to before me
this ___ day of December 2017

Hon. Carolyn K. Delaney
United States Magistrate Judge

Page 42   AFFIDAVIT OF CHRISTIAN E. NORGAARD

**United States v. Yaniv Gohar, Orel Gohar, May Levy, and Eran Buhbut**
**Penalties for Second Criminal Complaint**

**Defendants**
**YANIV GOHAR, OREL GOHAR, MAY LEVY, and ERAN BUHBUT**

**COUNT 1:**          **ALL DEFENDANTS**

VIOLATION:          18 U.S.C. § 1955 – Conducting an Illegal Gambling Business

PENALTIES:          Not more than 5 years of imprisonment,
                    Up to $250,000 fine, or both fine and imprisonment;
                    Not more than 3 years supervised release.

SPECIAL ASSESSMENT: $100 (mandatory on each count)